# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| WILLANA BONNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:13CV748 JAR |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Willana Bonner's ("Bonner") application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 404-433.

**I.  Background**

On February 16, 2011, Bonner filed applications for disability benefits and SSI. (Tr. 116-122) The Social Security Administration ("SSA") denied Bonner's applications on July 1, 2011. (Tr. 59-63) She filed a timely request for a hearing before an administrative law judge ("ALJ") on August 29, 2011. (Tr. 67-69) Following a hearing on April 3, 2012 (Tr. 30-54), the ALJ issued a written decision on April 13, 2012, upholding the denial of benefits. (Tr. 7-29) Bonner requested review of the ALJ's decision by the Appeals Council. (Tr. 5-6) On March 18, 2013, the Appeals Council denied Bonner's request for review. (Tr. 1-4) Thus, the decision of the ALJ stands as the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107 (2000).

Bonner filed this appeal on April 19, 2013. (Doc. No. 1) The Commissioner filed an Answer. (Doc. No. 11) Bonner filed a brief in support of her complaint (Doc. No. 15) and the Commissioner filed a brief in support of the answer. (Doc. No. 22) Bonner did not file a reply.

**II.     Decision of the ALJ**

The ALJ determined that Bonner had not engaged in substantial gainful activity since February 20, 2010, the date of her alleged disability onset. (Tr. 24) The ALJ found Bonner had the severe impairments of degenerative joint disease, but that no impairment or combination of impairments met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.)

After considering the entire record, the ALJ determined Bonner had the residual functional capacity ("RFC") to perform the exertional demands of less than light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds. (Id.) She can do less than the full range of light work as she is able to only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, and scaffolds; can only occasionally reach overhead, but can frequently reach in all other directions; and must avoid concentrated exposure to vibration. (Id.) The ALJ found Bonner's impairments prevented her from performing her past relevant work as a nurse's aide and certified medication technician; however, there are a significant number of jobs in the national economy that she can perform, including furniture rental consultant and tanning salon attendant. (Tr. 24-25) Thus, the ALJ concluded that a finding of "not disabled" was appropriate. (Tr. 23)

Bonner appeals, contending the RFC findings are not supported by substantial evidence. The Commissioner maintains that the ALJ's decision was supported by substantial evidence on the record as a whole.

### III. Administrative Record

The following is a summary of the relevant evidence before the ALJ.

#### A. Hearing Testimony

The ALJ held a hearing in this matter on April 3, 2012. Bonner testified and was represented by counsel. (Tr. 34-44; 53-54) Vocational expert Robin Cook also testified at the hearing. (Tr. 44-52)

##### 1. Bonner's testimony

At the time of the hearing, Bonner was 54 years old. (Tr. 35) She is a high school graduate with one year of technical school. (Id.) Bonner is a certified medical technician (CMT). (Tr. 36) She last worked as a CMT in February 2010 for Angels Healthcare. (Tr. 36) Prior to that, Bonner worked as a CMT/CNA for several nursing homes where her job duties were basically the same, i.e., assisting residents with all aspects of daily living. (Tr. 37-39) Bonner testified she can no longer do this work because of injuries sustained in a car accident and her inability to bend or stoop. (Tr. 39)

Bonner currently sees Dr. Steven Granberg, a pain management specialist. (Tr. 40) Her prescription medications include Vicodin taken every four hours for pain, Flexeril, a muscle relaxant, taken once every eight hours, and Restoril, a sleeping aid. (Id.) It was her testimony that the medications help "somewhat," but the side effects make her feel like she is "in a fog," in addition to some constipation. (Id.)

Bonner states she can walk three blocks before her back starts tightening up. (Id.) She can sit for 10-15 minutes but then has to stand up to keep her back from locking up. (Tr. 40-41) She cannot lift more than 5 pounds. (Tr. 41) Bonner says she has bad knees, and has been talking to her doctor about a total left knee replacement. (Tr. 42) She is limited in her reaching because the

3

muscles from her neck to across her left shoulder tighten up and prevent her from bringing her arm down without using her right hand to bring the shoulder down. (Tr. 43) Bonner testified she has been diagnosed with arthritis in her hands, knees, legs and hip. (Tr. 53) In addition she states she is bipolar[1], but admits this is not the reason she is not working. (Tr. 54)

Bonner lives alone. (Tr. 41) On a typical day she gets up around 7-8 a.m. to take her medication. (Tr. 44) If someone is with her, then she will take a bath; otherwise, she has too much difficulty getting out of the bathtub. (Tr. 41) After being up for a couple of hours, she has to lay down for 2-3 hours, depending on her pain, because her back starts tightening up. (Tr. 44) According to Bonner, she has to do this throughout the day. (Tr. 44) It was Bonner's testimony that she cannot stand up to cook, so will just put something in the microwave. (Id.) She cannot do any household chores but has family that comes over to help her with sweeping, mopping, laundry, and cooking. (Id.) Bonner has a driver's license and is able to drive. (Tr. 35) She goes to church on Sundays when she is able. (Tr. 42) In terms of hobbies, she likes to do puzzles, read and watch television. (Id.) She also cares for a small dog that her neighbor takes out for her. (Tr. 42-43)

2.     **Testimony of Vocational expert**

With respect to Bonner's vocational history, vocational expert Robin Cook testified that Bonner had past relevant work as a nurse's aide, Dictionary of Occupational Titles (DOT) number 355.674-014, and as a certified medication technician, DOT number 355.374-014, both with a specific vocational preparation (SVP) of four, semiskilled, medium exertional level, performed as heavy. (Tr. 47)

---

[1] No medically determinable impairment related to Bonner's allegation of bipolar disorder was found. (Tr. 321) The Commissioner notes that Bonner does not challenge the ALJ's evaluation of her alleged mental symptoms, nor does she argue that the ALJ erred in evaluating her alleged mental impairments. (Doc. No. 22 at 2 n.4)

4

The ALJ asked Cook to assume an individual of Bonner's age with her education and past work experience and the capability to perform at the light exertional level with the following limitations: only occasionally climb ramps and stairs, never climb ladders and scaffolds, occasionally balance, stoop, kneel, crouch and crawl, only occasionally reach overhead and frequently reach in all other directions. The individual is unlimited in fingering, handling and feeling. The individual must avoid concentrated exposure to vibration. (Tr. 48) Based on this hypothetical, Cook stated that Bonner could not perform the job of personal attendant. (Tr. 49) Cook further stated that Bonner could perform the jobs of furniture rental consultant (DOT 295.357-018), with 2,745 in Missouri and 157,485 in the national economy, and tanning salon attendant (DOT 359.567-014), with 310 in Missouri and 17,280 in the national economy. (Id.) Cook testified these jobs were light in exertional and strength level with a SVP of 2. (Id.)

The second hypothetical asked Cook to assume the limitations of the first hypothetical and that the individual would be off work three times a month for medical appointments. (Tr. 49) Cook stated that such a person would be unable to perform any other work in the regional and national economies. (Tr. 50) On cross-examination, Cook acknowledged that the jobs of furniture rental consultant and tanning salon attendant would be part-time positions. (Tr. 51)

**B.     Medical Records**

The ALJ summarized Bonner's medical records at Tr. 16-19. Relevant medical records are discussed as part of the analysis.

**IV.     Standards**

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); see also Brantley v. Colvin, 2013 WL 4007441, at * 2 (E.D. Mo. Aug. 2, 2013). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(B).

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the claimant has

one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id.

Before considering step four, the ALJ must determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is defined as "the most a claimant can do despite [his] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f); McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, he will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then he will be found to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v).

Through step four, the burden remains with the claimant to prove that he is disabled. Brantley, 2013 WL 4007441, at *3 (citation omitted). At step five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Id. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Meyerpeter v. Astrue, 902 F.Supp.2d 1219, 1229 (E.D. Mo. 2012) (citations omitted).

The Court's role on judicial review is to determine whether the ALJ's findings are supported by substantial evidence in the record as a whole. Pate–Fires v. Astrue, 564 F.3d 935,

942 (8th Cir.2009). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the Commissioner's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
> (2) The education, background, work history, and age of the claimant;
> (3) The medical evidence given by the claimant's treating physicians;
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
> (5) The corroboration by third parties of the claimant's physical impairment;
> (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and
> (7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

**V.    Discussion**

In her appeal of the Commissioner's decision, Bonner argues the ALJ's finding that she was not under a "disability" is not supported by substantial evidence, specifically because (1) the ALJ's findings as to Bonner's RFC were not supported by "some medical evidence" as required (Doc. No. 15 at 8-13) and (2) the hypothetical question posed to the vocational expert was not based on the concrete consequences of her impairment, and therefore, the expert's response did not constitute substantial evidence on which the ALJ's decision could rest. (Doc. No. 15 at 13-14)

**A. RFC finding**

A claimant's RFC is defined as the most an individual can do despite the combined effects of all of his or her credible limitations. Moore, 572 F.3d at 523. The ALJ must determine a claimant's RFC based on all of the record evidence, including the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (RFC must be determined based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations; RFC must be supported by some medical evidence). An ALJ may discredit a claimant's subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole. See Polaski, 739 F.2d at 1322; 20 C.F.R. § 404.1529; SSR 96–7p. It is the claimant's burden, not the Commissioner's, to prove the claimant's RFC. See Perks v. Astrue, 687 F.3d 1086, 1092 (8th Cir.2012) (burden of persuasion to demonstrate RFC and prove disability remains on claimant).

Bonner contends the ALJ fails to set forth the objective and medical opinion evidence supporting her RFC findings. (Doc. No. 15 at 10) Specifically, Bonner points to the medical evidence of record showing that following a car accident in February 2010, she had abnormal MRIs and CT scans. (Tr. 235, 240, 242-44, 248, 250-53) She had spinal surgery in April 2010. (Tr. 235) Her treating physician, George Schoedinger, M.D., noted that even after surgery Bonner continued to complain of pain. (Tr. 280, 291-92) In September 2010, Bonner underwent an anterior discectomy and interbody fusion at C4-5 and C5-6. (Tr. 299-300) In October 2010, Dr. Schoedinger indicated that Bonner was to remain off work. (Tr. 302) In November and December 2010, Dr. Schoedinger recommended Bonner seek pain management. (Tr. 304-05) When Bonner was seen by Steven Granberg, M.D., a pain management specialist, in December

2010, it was noted that she was still having neck spasms and low back pain, had been taking Vicodin on a regular basis, and had not been responsive to conservative measures. (Tr. 306) Dr. Granberg continued Bonner on Vicodin at that time. (Tr. 306, 313) Bonner proceeded with epidural steroid injection therapy in June 2011 (Tr. 335) and continued this treatment in October, November and December 2011. (Tr. 341-342, Tr. 346-347, Tr. 351-354) (Doc. No. 15 at 10-11)

In response, the Commissioner notes that the ALJ acknowledged Bonner had some symptoms and limitation of function, but determined, after discussing the objective medical evidence at length (Tr. 16-19), that the evidence did not support the severity of Bonner's symptoms. The record shows that following a car accident on February 20, 2010, Bonner went to the hospital with complaints of pain in her neck, back, shoulder, knees, and right foot. (Tr. 223) A physical examination revealed she had impaired balance, abnormal gait, and a muscle spasm in her neck, but also normal back inspection and full range of motion in her extremities. (Tr. 224) An x-ray of Bonner's neck showed some degenerative changes but was otherwise unremarkable. (Tr. 230) The examining physician assessed arthritis and cervicalgia. (Tr. 225) Bonner was given an ACE wrap for her knee, a soft C-collar for her neck, pain medicine, and muscle relaxers. (Tr. 225) She also received a note instructing her that she could return to work on February 22, 2010. (Tr. 229)

In March 2010, Bonner saw her treating physician, George Schoedinger, M.D., complaining of neck and low back pain. (Tr. 235-39) Upon examination, her cervical, dorsal, and lumbar spine appeared straight. (Tr. 238) She had decreased range of motion in her cervical spine, but was able to walk on her toes and heels. (Id.) Bonner had full range of motion in her extremities, normal reflexes, and no sensory deficits. (Tr. 238-39) X-rays of her neck and low back showed degenerative changes in her upper cervical spine and slight narrowing at the L5-S1

level, but were otherwise unremarkable. (Tr. 239-40) An MRI scan of Bonner's cervical spine showed broad based disc protrusion/herniation producing spinal canal stenosis and foraminal encroachment at several levels (Tr. 242), and an MRI scan of her lumbar spine showed broad based central protrusion at L5-S1 and moderate to severe foraminal stenosis. (Tr. 243)

Later that month, Dr. Schoedinger performed a cervical and lumbar myelogram and a cervical diskogram. (Tr. 246-55) Following those procedures, Dr. Schoedinger recommended surgery. (Tr. 256) Bonner underwent an anterior discectomy and instrumental interbody fusion at L5-S1 on April 28, 2010. (Tr. 268-78) The following month, she reported some stiffness in her lower back but stated that her preoperative symptoms had "disappeared" and that she was walking and engaging in as many activities as possible. (Tr. 280) A physical examination showed normal reflexes with no sensory deficits or motor weakness (Tr. 280). Dr. Schoedinger reported Bonner was "doing well" and encouraged her to "maintain a high level of activity." (Tr. 280) He also noted she should return for a follow-up appointment in two months and remain off work in the interim. (Tr. 280)

In June 2010, Bonner reported that she slipped and fell on her back. (Tr. 291) A physical examination showed her surgical wound remained well-healed. (Tr. 291) She had normal reflexes and no sensory loss or motor weakness. (Id.) X-rays of Bonner's back showed her implant position and alignment remained intact. (Id.) Dr. Schoedinger assessed a low back contusion and noted that Bonner's pain would "gradually subside with the passage of time." (Id.) The following month, Bonner reported that her symptoms had subsided such that she had minimal low back pain. (Tr. 295)

On September 1, 2010, Bonner underwent an anterior discectomy and instrumented interbody fusion at the C4-C5 and C5-C6 levels. (Tr. 296-301) One month later, she reported

11

occasional neck stiffness with rotatory motion, but stated that her upper limb symptoms had "disappeared completely." (Tr. 302) A physical examination showed Bonner had normal reflexes, no sensory loss, and no motor weakness. (Id.) X-rays of her neck revealed satisfactory implant position and alignment. (Tr. 302-03) Dr. Schoedinger noted Bonner was "doing well" and encouraged her to increase her activity level. (Tr. 302) He also noted that Bonner should return for a follow-up appointment in two months and to remain off work until that time. (Tr. 302)

By December 13, 2010, Dr. Schoedinger reported that Bonner's physical examination was unremarkable and her diagnostic imaging results showed that her instrumentation was intact. (Tr. 305) In addition, he noted Bonner had reached maximum medical improvement and recommended she see a pain management specialist. (Tr. 305) The next week, Bonner saw Dr. Steven Granberg. (Tr. 306-08) He recommended a lumbar epidural steroid injection; Bonner stated she would consider pursuing such treatment in the future. (Tr. 306-08) Dr. Granberg prescribed Vicodin for Bonner's pain. (Tr. 306-08) Four months later, she returned to Dr. Granberg's office complaining of pain going into the shoulders and pain in the low back. (Tr. 312) She also reported her condition was "a little better" as her medication provided "partial relief" of her pain symptoms. (Id.) Bonner was reluctant to undergo injection therapy at that time (Tr. 312); however, in June 2011, she decided to have an epidural steroid injection for her back pain. (Tr. 335) Dr. Granberg administered a steroid injection on July 6, 2011. (Tr. 337-40) In October 2011, Bonner reported 45 percent pain improvement from the injection therapy. (Tr.

341) In November 2011, she reported "near complete relief" from her pain with 90 percent improvement.[2] (Tr. 346)

In sum, while the medical evidence of record confirmed that Bonner had degenerative changes in her neck and lower back, the evidence also showed her physical examinations were consistently unremarkable. Her treating physician repeatedly noted she was "doing well" after surgery and encouraged her to increase her activity level. X-rays of Bonner's neck and back showed satisfactory implant position and alignment following her surgeries. In addition, Dr. Granberg's treatment notes indicated that Bonner's back pain improved after receiving epidural injections. The Court finds the ALJ properly considered the inconsistencies between Bonner's subjective allegations and the objective medical evidence. See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (an ALJ may determine that "subjective pain complaints are not credible in light of objective medical evidence to the contrary") (quotation omitted)); 20 C.F.R. §§ 404, 1529(c)(2), 416.929(c)(2).

The ALJ also noted Bonner's daily activities indicated a "fairly active lifestyle" supportive of a RFC of at least light work. (Tr. 20) Bonner reported difficulty lifting, sitting, climbing stairs, squatting, bending, kneeling, standing, reaching, walking, and using her hands. (Tr. 183) She also testified she could only walk three blocks, sit for 10 to 15 minutes, and lift no more than 5 pounds due to her physical condition. (Tr. 40-41) However, Bonner's function reports indicated that she drove a car, watched television, played on the computer, went outside once or twice a week, and shopped for groceries. (Tr. 170, 173, 178, 181, 187) She occasionally needed help getting dressed, caring for her hair, and getting in the bathtub, but otherwise had no

---

[2] The ALJ found it significant that Bonner's physical condition improved with medication (Tr. 20). See Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (internal citation omitted).

problems attending to her personal care. (Tr. 171, 179) Bonner also fed and cared for her small dog and prepared simple meals on a daily basis. (Tr. 41-42, 171-72, 179-80) She attended church on Sundays and enjoyed reading and completing puzzles. (Tr. 42)

Bonner argues she need not prove she is bedridden to establish disability. (Doc. No. 15 at 12) The Court agrees that the extent of daily living activities does not alone show an ability to work. However, such activities, along with the other evidence, may be considered when evaluating a claimant's credibility. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990). Here, Bonner's daily activity was just one of several factors considered by the ALJ in discounting Bonner's credibility. (Tr. 14-20)

Bonner further argues the ALJ impermissibly relied on the opinion of a non-examining physician for her RFC finding, citing Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003) ("the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision"), and erred by not giving more weight to Dr. Schoedinger's treating physician opinion that she remain off work. (Doc. No. 15 at 12-13)

The examining relationship is one of many factors the ALJ may consider in weighing medical opinions. See 20 C.F.R. §§ 404.1527(c)(2)(ii)(1)-(6); 416.927(c)(2)(ii)(1)-(6). While a treating physician's opinion is generally entitled to substantial weight, such an "opinion does not automatically control in the face of other credible evidence on the record that detracts from that opinion." Brown v. Astrue, 611 F.3d 941, 951-52 (8th Cir. 2010) (quoting Heino v. Astrue, 578 F.3d 873, 880 (8th Cir.2009) (internal quotations and citation omitted). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Heino, 578 F.3d at 879 (internal quotations and citations omitted). See also Halverson v. Astrue, 600 F.3d 922, 929–30 (8th Cir.

2010) ("When a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."); Owen v. Astrue, 551 F.3d 792, 797 (8th Cir. 2008) (same). A review of the record shows the ALJ considered medical opinions from Bonner's treating physician George Schoedinger, M.D.[3], pain management specialist Steven Granberg, M.D.[4], and consultative examiner Susan Rosamond, M.D. (Tr. 17-19)

In her physical residual functional capacity assessment, Dr. Rosamond acknowledged that Bonner underwent a cervical fusion procedure and had been diagnosed with degenerative disc and joint disease in her lumbar spine, but opined that Bonner could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for at least 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8-hour workday; and push or pull without limitation. (Tr. 316) Dr. Rosamond also determined that Bonner could occasionally climb ramps and stairs but could not climb ladders, ropes, or scaffolds. (Tr. 317) Dr. Rosamond further noted that Bonner could occasionally balance, stoop, kneel, crouch, and crawl, but was limited in her ability to reach overhead due to neck problems. (Id.) Lastly, she found Bonner should avoid concentrated exposure to vibration (Tr. 318). After summarizing the medical evidence, Dr. Rosamond opined that a "reduced RFC reflects reasonable work capability based on all objective and subjective findings." (Tr. 317) This opinion is consistent with the medical evidence of record discussed above showing Bonner had a normal back inspection, full range of motion in the extremities, normal reflexes, and ability to walk on the toes and heels. Thus, substantial evidence supports the ALJ's rationale for giving great weight to Dr. Rosamond's opinion. (Tr. 19)

---

[3] Dr. Schoedinger did not complete a medical opinion form. Instead he prepared several treatment notes during the relevant time period. (Tr. 235-305)

[4] Bonner does not challenge the ALJ's evaluation of Dr. Granberg's opinion. (Doc. No. 15 at 11 n.6)

The ALJ also considered Dr. Schoedinger's treatment notes from March to December 2010 in formulating her RFC finding. (Tr. 17-19) During that time, Dr. Schoedinger consistently noted that Bonner had normal reflexes with no sensory deficits or motor weakness. (Tr. 280, 291, 302) He also reported Bonner was "doing well" after surgery and encouraged her to "maintain a high level of activity." (Tr. 280, 302) Further, Dr. Schoedinger did not impose any work-related limitations on Bonner beyond advising her to stay off work until she returned for follow-up appointments. (Tr. 280, 302) Indeed, the ALJ observed that no doctor ever stated or suggested that Bonner was disabled or totally incapacitated. (Tr. 19) Bonner's reliance on Dr. Schoedinger's treatment notes to show she was disabled is misplaced. See Rice v. Apfel, 990 F. Supp. 1289, 1294 (D. Kan. 1997) (the fact that no treating physician found plaintiff incapable of work "alone might be considered substantial evidence for the ALJ's decision"). (Doc. No. 22 at 13-14)

For all these reasons, the Court finds and concludes that the ALJ's RFC determination is supported by substantial evidence.

**B. Hypothetical question**

The ALJ's hypothetical questions to a vocational expert must include those impairments the ALJ finds are substantially supported by the record as a whole. McNeil v. Colvin, 2014 WL 4055363, at *6 (E.D.Mo. Aug. 15, 2014) (citing Buckner v. Astrue, 646 F.3d 549, 561 (8th Cir.2011)). But the ALJ "may omit alleged impairments from a hypothetical question" posed to a vocational expert if there is "no medical evidence that those conditions impose any restrictions on [a claimant's] functional capabilities." Id. (quoting Owen, 551 F.3d at 801–02).

Bonner argues that because substantial evidence did not support the ALJ's RFC determination, the hypothetical question to the vocational expert encapsulating that

determination failed to capture the "concrete consequences" of her impairment. (Doc. No. 15 at 13) However, as discussed in detail above, substantial evidence supports the RFC determination. Thus, the ALJ did not err by relying on the vocational expert's response to the hypothetical questions. See Garrison v. Colvin, 2014 WL 2452954, at *7 (E.D. Mo. June 2, 2014).

**VI.     Conclusion**

For the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. A separate judgment will accompany this Order.


Dated this 29th day of September, 2014.

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**